[No. 10185. Department Two. May 23, 1912.]

FRANKLIN COUNTY, *Respondent*, v. A. A. BARNES, *Appellant*.[1]

COUNTIES—COUNTY OFFICERS—SALARY—CLERK OF COURT—FEES—TITLE TO NATURALIZATION FEES. One-half of the naturalization fees paid to a salaried county clerk, under 34 U. S. Stat. 596, and authorized by the act to be retained by the clerk for his own use, belong to the county and must be accounted for by the clerk, under Const., art. 11, §§ 5 and 8, requiring the legislature to regulate their compensation, provide for strict accountability by them for all fees collected, and fix their compensation by salaries, and Rem. & Bal. Code, § 4065, providing a salary which shall be full compensation for all services, § 4066, requiring salaried officers to collect and pay into the county treasury all fees now or hereafter allowed by law, paid, or chargeable, and § 4073, to the same effect and prohibiting the retention to his own use or profit of any sum paid him in his office or by virtue of his office, by virtue of the laws of this state or of the United States.

COUNTIES—COUNTY OFFICERS—SALARY—STATUTES — CONSTRUCTION —STATE AND FEDERAL CONFLICT. The United States statute, 34 U. S. Stat. 596, authorizing clerks of state courts to retain one-half of the naturalization fees paid to them, does not conflict with the state constitution and laws providing a salary for county officers which shall be in full compensation for their services, and providing that all such fees received shall be the property of the county and paid into the county treasury; since the fees are paid for acts done in official capacity, and the Federal act evinces no purpose to interfere with the disposition of the clerk's fees as between him and the state.

[1]Reported in 123 Pac. 779.

Appeal from a judgment of the superior court for Thurston county, Mitchell, J., entered December 23, 1911, in favor of the plaintiff, upon sustaining a demurrer to the complaint, in an action for money received. Affirmed.

*G. C. Israel, Frank C. Owings,* and *Thos. L. O'Leary,* for appellant.

*The Attorney General* and *C. M. O'Brien,* for respondent.

ELLIS, J.—Action by Franklin county against A. A. Barnes, county clerk of that county, for one-half of certain fees collected by him in naturalization proceedings. A demurrer to the complaint was overruled, the defendant declined to plead further, and judgment was entered against the defendant from which he appeals.

The case presents but one question. May the county clerk retain for his own use one-half the fees collected in naturalization proceedings under the act of Congress of June 29, 1906 (34 Stat. at Large, 596), or is he bound to account for such fees to the county as in case of other fees collected by him? No question is made as to the sufficiency of the complaint to raise this issue.

The pertinent part of the act of Congress referred to reads:

"The clerk of any court collecting such fees is hereby authorized to retain one-half of the fees collected by him in such naturalization proceeding; the remaining one-half of the naturalization fees in each case collected by such clerks, respectively, shall be accounted for in their quarterly accounts, which they are hereby required to render the Bureau of Immigration and Naturalization. . . .

"Provided, That the clerks of courts exercising jurisdiction in naturalization proceedings shall be permitted to retain one-half of the fees in any fiscal year up to the sum of three thousand dollars, and that all fees received by such clerks in naturalization proceedings in excess of such amount shall be accounted for and paid over to said bureau as in case of other fees to which the United States may be entitled under

the provisions of this act. The clerks of the various courts exercising jurisdiction in naturalization proceedings shall pay all additional clerical force that may be required in performing the duties imposed by this act upon the clerks of court from fees received by such clerks in naturalization proceedings. And in case the clerk of any court collects fees in excess of the sum of six thousand dollars in any one year, the Secretary of Commerce and Labor may allow to such clerk from the money which the United States shall receive additional compensation for the employment of additional clerical assistance, but for no other purpose, if in the opinion of the said secretary the business of cuch clerk warrants such allowance."

The state constitution, in section 6, of article 4, provides that the superior court "shall have the power of naturalization and to issue papers therefor." The same power is vested in the superior courts of the state by statute. Rem. & Bal. Code, §§ 15, 16.

The constitution, in section 5, of article 11, makes it incumbent upon the legislature to provide by general and uniform laws for the election of county officers, including county clerks, prescribe their duties, fix their terms of office, regulate their compensation, in proportion to their duties, and for that purpose authorizes the legislature to classify counties by population, and further declares:

"And it shall provide for the strict accountability of such officers for all fees which may be collected by them, and for all public moneys which may be paid to them or officially come into their possession."

Section 8, of the same article, provides that,

"The legislature shall fix the compensation by salaries of all county officers, . . . except that public administrators, surveyors and coroners may or may not be salaried officers. . . ."

In *Cox v. Holmes,* 14 Wash. 255, 44 Pac. 262, this court construed this section as intended to provide a fixed and established "compensation by time," as distinguished from the-

fee system theretofore prevailing, holding the word "salary" as used in the constitution to mean "a payment dependent on the time and not on the amount of service rendered," citing *State ex rel. Murphy v. Barnes*, 24 Fla. 29, 3 South. 433; See, also, *State ex rel. Stratton v. Maynard*, 35 Wash. 168, 76 Pac. 937. There can be no question but that it was the intent of the framers of the constitution that the compensation of salaried officers should be by a fixed salary for their time, and not by fees for specific services.

The legislature, in pursuance of these constitutional provisions, at its first session passed an act classifying counties by population and fixing the compensation by salaries, of the officers to be elected therein, with certain immaterial exceptions. Laws 1890, p. 302; Rem. & Bal. Code, §§ 4031 *et seq.* Section 32 of the act (Rem. & Bal. Code, § 4065), provides in part:

"In accordance with the classification herein made, the county officers of the counties of this state, according to their class, shall receive a salary for the services required of them by law, or by virtue of their office, which salary shall be full compensation for all services of every kind and description rendered by the officers named therein: . . ."

Section 33 of the act (Rem. & Bal. Code, § 4066), reads:

"All salaried officers of the several counties of this state shall charge and collect for the use of their respective counties, and pay into the county treasury on the first Monday in each month, all the fees now or hereafter allowed by law, paid or chargeable in all cases except such fees as are a charge against the county or state."

In 1893, another act was passed directing the disposition of fees collected by salaried officers. Laws 1893, p. 184. Section 1 of that act (Rem. & Bal. Code, § 4073), is as follows:

"Every county officer, who, by the laws of this state is allowed a salary, shall, on the first Monday of each month, pay into the county treasury all moneys and sums which have come into his hands for fees and charges in his office, or

by virtue of his office, during the preceding month. And no officer is permitted to retain to his own use or profit any sums paid him in his office or by virtue of his office, no matter from what source, but all of such moneys so paid him by virtue of the laws of this state, or of the United States, shall be the property of the county."

Section 2 of that act (Rem. & Bal. Code, § 4081), declares the officer failing to pay any such fees so collected guilty of embezzlement and punishable therefor.

These statutes, and especially the act of 1893, leave no room for doubt as to the legislative intent. Every salaried officer is required to pay into the county treasury all moneys "paid him by virtue of the laws of this state, or of the United States." Such moneys are declared to be "the property of the county." The language is too plain for construction. The statute was designed to cover, and does cover, fees paid to the clerk under the act of Congress relating to naturalization.

The appellant contends that, inasmuch as the Federal constitution (§ 8, art. 1) confers upon Congress the power "to establish a uniform rule of naturalization," and Congress has, by the act of June 29, 1906, above quoted, established such a rule, definitely fixing the fees to be charged and the method of collecting and accounting for such fees, its jurisdiction is exclusive and therefore that act supersedes all state legislation upon the subject.

The premises are correct, but they do not justify the broad conclusion. By what seems to us to be a correct construction of the act of Congress and the state statutes, they present, at most, only an apparent, not a real conflict. In order to create such a conflict, resort must be had and an implication which is neither necessary to the purposes of the Federal statute nor unavoidably conveyed by the language used therein. The authorization of the clerk, "to retain one-half of the fees," does not necessarily imply a grant to him of those fees for his own use. The sentence in which this

authorization is found was palpably intended merely to fix
the basis of adjustment between the clerk and the bureau.
With that adjustment, the interest of the Federal govern-
ment ends.   It can be no matter of concern to the United
States nor to the bureau of immigration and naturalization,
the beneficiary of one-half of the fees, what disposition be
made of the other half retained by the clerk on the adjust-
ment.   Courts will not invoke an implication not necessary to
the purpose of the law in order to raise a conflict between a
Federal and a state statute which would not otherwise exist.
The objects of the two statutes, state and Federal, are dif-
ferent.   The language of each must be restricted to its own
object or subject.   This is a rule of construction often in-
voked to avoid an apparent conflict between two statutes of
the same state (Endlich, Interpretation of Statutes, § 211;
Lewis' Sutherland Statutory Construction (2d ed.), p. 468),
and there is equal reason for its application as between Fed-
eral and state legislation.   The obvious purpose of the Fed-
eral statute was to exercise the power "to establish a uni-
form rule of naturalization" conferred by section 8, of article
1, of the Federal constitution.   It evinces no purpose to in-
terfere with the power of the state legislature to fix the full
compensation of county officers or to modify the duties im-
posed by the legislature upon those officers in accounting to
the county.   While the procedure, the forum, and the amount
of the fees to be charged in naturalization proceedings are
matters going to the uniformity of those proceedings, and
are therefore within the exclusive power of Congress to fix,
(*State ex rel. Newman v. Libby*, 47 Wash. 481, 92 Pac.
350), what disposition is made of the half of the fees re-
linquished by the act in no manner affects the uniformity of
the rule of naturalization the establishment of which is the
sole purpose of the Federal law as meeting the full purpose
of the constitutional provision pursuant to which it was en-
acted.   On the other hand, the state statute does not trench
upon any matter connected with the uniform rule of natural-

ization established by the act of Congress. It merely directs the disposition of money coming into the hands of the county clerk after all right or claim thereto has been relinquished by the act of Congress. When the objects of the two statutes are considered and the language of each restricted to its object there is no conflict.

It is argued that the duties of the clerks in naturalization proceedings are outside of their duties as clerks, and that therefore the disposition of the fees, as well as the fixing of their amount, is within the power granted to the general government. We are not called upon to determine the extent of the power granted to Congress, but only the extent to which it has exercised that power. From what we have said, we think it plain that there was no intention by the act in question to make a final disposition of the half of the fees relinquished by Congress, but only to provide a basis of accounting for the fees collected as between the clerk and the bureau. But aside from this, which we conceive to be a sufficient answer, we think the argument proceeds upon an unsound assumption. Both on reason and authority, we hold that, where fees are paid to a county clerk, clerk of a state court, or other state or county officer, for services performed under a Federal statute, that officer receives the money by virtue of the office created by the state law. The clerk acts in an official not a personal capacity. The certificate issued is an official not a personal document. *Barron County v. Beckwith,* 142 Wis. 519, 124 N. W. 1030, 135 Am. St. 1079, 30 L. R. A. (N. S.) 810; *City and County of San Francisco v. Mulcrevy,* 15 Cal. App. 11, 113 Pac. 339; *Rhea v. Board of County Com'rs,* 13 Idaho 59, 88 Pac. 89; *Finley v. Territory ex rel. Keys,* 12 Okl. 621, 73 Pac. 273; *People ex rel. Whittemore v. Seabury,* 23 How. Pr. 121.

The clerk is designated by the act of Congress to receive the fees because he is clerk of the court designated by the act to naturalize aliens. It was the office which was in the legislative mind not the individual. It was the clerk as clerk.

In *Barron County v. Beckwith, supra,* a case deciding the exact question here presented, the statute of Wisconsin involved provided that the clerk should pay to the county treasurer "all fees, *per diem* and other emoluments of whatever kind received by him," and that the salary of the clerks and deputies should be in "lieu of all fees, *per diem* and compensation for services rendered." In disposing of the same argument here under consideration the court said:

"It is insisted that such services are performed in a nonofficial capacity, therefore belong to the clerks exclusively and are not covered by the state law or the resolution requiring fees and emoluments received by clerks in their official capacity to be turned over to the county. And it is argued that clerks would not be obliged to turn over money earned in work purely nonofficial, as, for example, time not required in discharge of official duty spent in bookkeeping. This might be admitted, but it does not reach the question, because in the case before us the services were strictly official. The naturalization proceedings are proceedings in court, and the clerk in performance of services therein acts in his official capacity as clerk of the court. The act of Congress purports to confer jurisdiction to naturalize aliens on 'all courts of record in any state.' And the courts of record in this state have uniformly from an early day assumed such jurisdiction, and the clerks of the circuit courts have acted in their official capacity in such proceedings before and since the act of Congress. That the circuit courts of the state have jurisdiction to naturalize aliens is beyond question. This is not denied by counsel for appellant, but it is argued that the jurisdiction is limited or quasi-judicial in its nature, and that Congress might designate the board of aldermen of cities to determine the requisite facts to entitle to citizenship under the conditions prescribed by law. Whether Congress could have conferred the power on other bodies than courts of record we need not determine. It is sufficient that it has authorized courts to perform the function and provided the fees to be received by clerks for the performance of their duties as clerks of courts in that regard. The courts, having assumed to act, have the right to do so in the absence of any law of the state prohibiting such action."

The California case of *City and County of San Francisco
v. Mulcrevy, supra,* involved a charter provision of the city
which required every officer to "pay all moneys coming into
his hands as such officer, no matter from what source derived
or received, into the treasury of the city." That action, like
the one before us, was brought to recover from the clerk
fees collected in naturalization proceedings under the Fed-
eral act of 1906. The same line of defense was presented as
here. The court said:

"The money came into the hands of Mulcrevy as such
clerk, although the source from which it was derived and re-
ceived was the amounts paid to him as fees in naturalization
proceedings as prescribed and provided for in the act of
Congress; and it was his duty to pay it into the treasury of
the city and county. Language could not be more explicit.
It does not admit of doubt or quibble as to its meaning. 'No
matter from what source derived' means all the money com-
ing into his hands by virtue of and by reason of his being
such county clerk and *ex officio* clerk of the superior court.
It was by reason of his election as county clerk and his
taking office and giving his bond, and receiving a salary of
$4,000 per annum, that he was enabled to receive the fees
for naturalization proceedings in the superior court. He
received them in his official capacity. He was *ex officio* clerk
of the superior court in which the fees were collected under
the provisions of the act of Congress. The act authorized
him to retain one-half the fees collected by him; but as to
what he was to do with such half so retained did not concern
the United States government, but was a matter solely be-
tween himself and the city and county of San Francisco."

The reasoning of the supreme courts of Wisconsin and
California in the cases quoted appeals to us as sound, and in
view of the further consideration that there is no necessary
conflict between the state and Federal statute, we are im-
pelled to the same conclusion reached by those courts.

We have not overlooked the fact that the supreme courts
of Utah and Massachusetts, upon the same question, have
reached a contrary conclusion. *Eldredge v. Salt Lake*

*County,* 37 Utah 188, 106 Pac. 939; *Inhabitants of Hampden County v. Morris,* 207 Mass. 167, 93 N. E. 579. These decisions proceed upon what we believe to be a mistaken assumption that the state statutes involved were in necessary conflict with the Federal law.

The disposition of these fees is a question between the clerk and the state. The clerk derives his office from the state. He takes the office upon the condition that he pay into the county treasury all fees collected by virtue of that office. This is a matter with which the Federal government has no concern. Despite the high standing which the Massachusetts court justly holds, its decision, as it seems to us, discloses its own fallacy. It says:

"If the legislature had seen fit, in reference to the fees for services in naturalization cases, to declare that the statutory salary elsewhere provided should be diminished by the amount received as fees in proceedings for naturalization, the provision might have been enforced."

It is manifest that, if there is a real conflict between the state and Federal statutes, and that the act of Congress is to be construed as making a final disposition of these fees, the conflict could not be obviated nor the purpose of the Federal act defeated by any such subterfuge. We know of no authority for a state, or an individual, doing by indirection what may not be done directly. A further review of the authorities cited by the appellant seems unnecessary.

The judgment is affirmed.

DUNBAR, C. J., MOUNT, MORRIS, and FULLERTON, JJ., concur.