**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3686
_____

MARC HOMER,
                                Appellant

v.

NATIONWIDE MUTUAL INSURANCE COMPANY

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D. C. Civil Action No. 2-15-cv-01184)
District Judge:  Honorable Nora B. Fischer

_____

Submitted under Third Circuit LAR 34.1(a)
on May 24, 2017

Before:  HARDIMAN, ROTH and FISHER, <u>Circuit Judges</u>

(Opinion filed: February 27, 2018 )

_____

OPINION[*]

_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

ROTH, Circuit Judge

Marc Homer brings a claim for bad faith trial conduct against Nationwide Mutual Insurance Company for its introduction and reliance on allegedly biased expert testimony. The District Court dismissed the suit for failure to state a claim. For the following reasons, we will affirm.

I.

While driving his mother's car, Marc Homer was struck by a driver who drifted from her lane of travel. Homer sustained numerous injuries as a result of the accident, including a possible brain injury. After settling with the other driver's insurance company for $24,500.00, Homer sought to collect from Nationwide Mutual Insurance Company under his mother's underinsured motorist policy. Homer sought the policy maximum of $500,000.00 in underinsured motorist benefits and rejected Nationwide's proposed settlement of $12,500.00.

A jury trial commenced on May 28, 2015. During the course of the trial, Homer's counsel drafted a Binding High/Low Settlement Agreement. The Agreement specified that "the maximum amount of total underinsured motorist benefits . . . will be $300,000 and the minimum . . . will be $100,000."[1] The Agreement stipulated that Homer dismissed "[a]ll claims for bad faith for acts or omissions occurring prior to the date of the execution of this Agreement" but not any such "occurring after the date of the execution of this [Agreement]."[2] Nationwide signed the Agreement on June 1, 2015.

_____

[1] App. 202.
[2] App. 202-203.

2

On June 1, after the High/Low Agreement was signed, Nationwide introduced the testimony of two expert witnesses regarding Homer's injuries: Dr. Ferraro, a neurosurgeon, and Dr. Petrick, a clinical neuropsychologist. At closing arguments, Nationwide recapped both experts' testimony. The jury awarded Homer $1.6 million, and Nationwide moved to mold the verdict according to the High/Low Agreement. Because of a dispute over the wording of the request,[3] the Court of Common Pleas of Allegheny County denied Nationwide's request but did dismiss with prejudice "[a]ll bad faith claims for defendant's acts or omissions occurring before June 1, 2015[.]"[4]

On September 10, 2015, Homer filed suit in the Western District of Pennsylvania, alleging that Nationwide acted in bad faith on and after the date the Agreement was executed, under 42 Pa. Cons. Stat. § 8371 and the Unfair Trade Practices and Consumer Protection Law (UTPCPL). Homer filed an Amended Complaint on February 8, 2016. Homer alleged that the following acts by Nationwide constituted bad faith: introducing into evidence, and relying on, the biased testimony of Dr. Ferraro and Dr. Petrick; failing to make an honest, intelligent settlement offer; and seeking to have the bad faith claim dismissed with prejudice. Nationwide filed a motion to dismiss.

The District Court looked to other jurisdictions' approach to bad faith claims based on litigation conduct and predicted that the Pennsylvania Supreme Court would

---

[3] Nationwide requested that Homer's bad faith claims be dismissed "as of June 1, 2015," App. 191; Homer instead argued that the Agreement only excluded claims for bad faith "occurring prior to [June 1, 2015]." App. 200.

[4] Plaintiff's Memorandum of Law in Opposition to Nationwide's Motion to Dismiss (No. 2-15-cv-01184, ECF No. 9), at *4. Nationwide claims that the trial court eventually molded the verdict to $300,000, and Homer does not seem to contest this.

allow "evidence of litigation conduct [to] be admissible as evidence of bad faith but only in 'rare cases involving extraordinary facts.'"[5]  Because the facts alleged in Homer's complaint did not constitute such a rare case, the District Court granted Nationwide's motion to dismiss with prejudice on August 26, 2016.

On appeal, Homer raises only two issues regarding his claim under 42 Pa. Cons. Stat. § 8371:[6]  First, Homer argues that the District Court erred in concluding that the Pennsylvania Supreme Court permits bad faith claims for litigation conduct only in rare circumstances.  Second, Homer argues that even under this more restrictive standard, Nationwide's offering and relying on biased testimony constitute such a rare circumstance.

## II.[7]

Under 42 Pa. Cons. Stat. § 8371, an insurance company may not act in bad faith toward its insured.  While "bad faith" has not been formally defined, the Pennsylvania Superior Court defines it as "any frivolous or unfounded refusal to pay proceeds of a policy[.]"[8]  We have held that "a plaintiff must show by clear and convincing evidence

---

[5] App. 266.

[6] While Homer originally raised three acts constituting bad faith, on appeal he contests only the allegedly biased testimony.

[7] The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction over the appeal under 28 U.S.C. § 1291.  We exercise plenary review over a grant of a motion to dismiss. Because "a federal court must apply the substantive laws of its forum state in diversity actions," *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007), *as amended* (July 19, 2007), *as amended* (Nov. 23, 2007) (citation omitted), we apply Pennsylvania substantive law.

[8] *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 905 (Pa. Super. Ct. 1999).

4

that the insurer (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim."[9]

Although Pennsylvania courts have not yet defined what litigation conduct may constitute "bad faith,"[10] we need not decide this question here because Homer's allegations do not identify any misconduct, much less bad faith, on Nationwide's part. In analyzing the sufficiency of the factual allegations, we are able to consider the depositions and testimony attached as exhibits to, and relied upon by, the complaint.[11] Because the facts in these materials do not state a claim even if the District Court had applied a more permissive standard, we need not decide whether the District Court correctly predicted that the Pennsylvania Supreme Court would only find bad faith in rare litigation conduct.

The offensive testimony involves two experts: Dr. Ferraro and Dr. Petrick. We address each testimony in turn.

## A.

---

[9] *W.V. Realty, Inc. v. N. Ins. Co.*, 334 F.3d 306, 312 (3d Cir. 2003) (citation omitted).

[10] The Pennsylvania Superior Court has held that litigation conduct can constitute bad faith. *O'Donnell*, 734 A.2d at 906 ("[S]ection 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation."). However, neither it nor the Pennsylvania Supreme Court have clarified what litigation conduct qualifies. Both this Court and the Pennsylvania Superior Court have, however, held that pure discovery violations cannot rise to the level of bad faith. *W.V. Realty*, 334 F.3d at 314; *O'Donnell*, 734 A.2d at 908-09. Homer claims that the presentation of biased expert testimony is sufficiently distinguishable from a mere discovery violation that it can constitute bad faith. *See Hollock v. Erie Insurance Exchange,* 842 A.2d 409, 415 (Pa. Super. Ct. 2004) (holding that an insurance company's "intentional attempt to conceal, hide or otherwise cover-up the conduct of [its] employees" may rise to the level of bad faith). We need not reach this question because the facts alleged clearly do not amount to knowing presentation of biased expert testimony.

[11] *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

Homer alleges that Dr. Ferraro originally diagnosed Plaintiff with cognitive deficits in his expert report and then changed his testimony in his deposition. Both parts of this contention are false; Dr. Ferraro's report was not a diagnosis, and his testimony did not contradict his expert report. In relevant part, Dr. Ferraro's expert report noted that "Mr. Homer's major problem at this time appears to be his cognitive and memory issues. . . . I suspect that [Homer's] difficulty trying to find and maintain a job has to do with his cognitive problems."[12] While Homer alleges that this constitutes a diagnosis of cognitive impairments, the subsequent sentence make clear that it was not. Dr. Ferraro added, "I would recommend he undergo formal neuropsychological testing and evaluation at either a Concussion Clinic or by a psychiatrist."[13] Dr. Ferraro's deposition testimony reveals a consistent concern and recommendation: While Dr. Ferraro testified that he suspected that Homer's difficulty trying to find and maintain a job had to do with his cognitive problems, he noted that this conclusion was "dependent on the testing. So if the testing comes out and confirms it, I agree."[14] Accordingly, Dr. Ferraro did not change his testimony between his expert report and deposition.

It is true that on redirect Dr. Ferraro was asked whether the "stuff that [he] mentioned in [his] report . . . is the stuff that Mr. Homer told [him] he was experiencing, correct?"[15] He responded, "Right. Those are the symptoms he was complaining of, and that's what seemed to be his major complaint and major issues were that, so that's why I

---

[12] App. 108.
[13] App. 108.
[14] App. 97.
[15] App. 101.

6

said this needed—what needs to be looked into cause this is where he seems to be having his problem."[16]  However, because the expert report clearly was not making a formal diagnosis, and both the deposition testimony and expert report recommended further study by a specialist, these statements cannot form the basis of a bad faith claim.

Taken together, the statements in Dr. Ferraro's report and his testimony are clearly not contradictory; accordingly, Nationwide's introduction and reliance on this testimony cannot constitute bad faith.

**B.**

Similarly, Homer alleges that Nationwide knew that Dr. Petrick was biased because he had a history of giving favorable testimony for whichever side he represented. The complaint refers to testimony in which Homer's attorney presented previous reports that Dr. Petrick did for other clients:  sixteen for defendants and one for a plaintiff.   In the plaintiff report, Dr. Petrick found that the plaintiff had cognitive deficits three years after his original injury.[17]  Homer claims this is contradictory to statements made in the sixteen defendant reports, specifically that "[t]he acute effects of concussion resolve quickly."[18]  However, upon examination of these seemingly contradictory statements, it is clear that there is no contradiction.  Dr. Petrick qualified his statement about the fleeting symptoms of concussions by saying that "[b]y definition, a concussion results in a temporary disruption of cellular function . . . . That's not to say that there could not [be]

---

[16] App. 101.

[17] Homer alleges that Dr. Petrick also testified that the plaintiff would not return to his premorbid capacity or occupational level of function.  App. 37.

[18] App. 119.

lingering symptoms.  That's known as post-concussion syndrome."[19]  Tellingly, in the

plaintiff report, Dr. Petrick diagnosed the plaintiff as having post-concussion syndrome.[20]

Since there is no contradiction, these statements cannot serve as a basis for bad faith.

Because the statements made by Dr. Petrick and Dr. Ferraro are not contradictory,

Nationwide's introduction of and reliance on their testimony cannot rise to the level of

bad faith, even under Homer's suggested legal standard.

### III.

For these reasons, we will affirm the District Court's order, dismissing Homer's

bad faith claim.

---

[19] App. 119.
[20] App. 124-25.